UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Warren Wallis,
        Plaintiff

        v.                              Case No. 15-cv-525-SM
                                        Opinion No. 2017 DNH 039
HCC Life Insurance Company,
        Defendant

### O R D E R

Warren Wallis originally brought this action in New
Hampshire Superior Court, seeking a judicial declaration of
entitlement to coverage under a short-term major medical
insurance policy issued by HCC Life Insurance Company.  See N.H.
Rev. Stat. Ann. ("RSA") 491:22 ("Declaratory Judgments").  HCC
Life removed the action, invoking this court's diversity
jurisdiction.  It then filed two counterclaims, seeking a
judicial declaration that it properly rescinded the policy or,
in the alternative, that Wallis is not entitled to coverage
under that policy.

Pending before the court is HCC Life's motion for summary
judgment.  Wallis objects.  For the reasons discussed, that
motion is granted.

## Standard of Review

When ruling on a motion for summary judgment, the court must "constru[e] the record in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in that party's favor." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "[a]n issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016) (citations and internal punctuation omitted). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). In other words, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enterprises, Inc., 769 F.3d 23, 29-30 (1st Cir. 2014).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party.  <u>See generally</u> Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions.  <u>See</u> <u>Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).

**Background**

HCC Life claims that when Wallis completed his application for insurance, he was obligated, but failed, to disclose the fact that he had been diagnosed with, and treated for, "heart disease" within the past five years.  Consequently, a discussion of Wallis's medical history – at least as it relates to his cardiac issues – is warranted.

I.   <u>Wallis's Medical History</u>.

On January 9, 2011, Wallis went to the emergency room at the Monadnock Community Hospital, in Peterborough, New Hampshire, with complaints of rapid and erratic heart beats over a period of about two hours, and difficulty sleeping for about a week.  As part of his medical history, Wallis reported that one

of his siblings suffers from cardiac arrhythmia, though he did not know the details.  Upon examination, it was noted that he was in atrial fibrillation.  He was given aspirin and Lopressor (metoprolol), a type of drug known as a beta-blocker, and he eventually converted back into a normal sinus rhythm.[1]  Later, an electrocardiogram (EKG) revealed that, even though he was no longer in atrial fibrillation, "changes were still prominent especially with the anterior T-wave inversions that were of concern and the incomplete left bundle-branch block and LVH."  Wallis was admitted to the hospital for observation and a cardiology consult.

The following day, he met with a cardiologist, Dr. Beatty Hunter, who reported Wallis's "permanent problem list" as "organic heart disease," which included "new onset atrial fibrillation, duration 2 hours," an "incomplete left bundle branch block," and "mild left ventricular hypertrophy."  Later that day, Wallis was discharged and prescribed Toprol XL, a low-

---

[1]    Patients with atrial fibrillation are at higher risk for stroke because the heart's chaotic rhythm can cause blood to pool in the heart's upper chambers.  That, in turn, can cause blood clots to form and (potentially) dislodge.  Accordingly, Wallis was given aspirin and a beta-blocker in an effort to lower that risk.  See Declaration of Jonathan Alexander, MD, FACP, FACC (document no. 12-8) at paras. 9-10.  See also Deposition of Jonathan Gomberg, MD, FACC (document no. 12-7) at 21.

dose beta-blocker, and aspirin (325 mg per day).  He was also told he could engage in physical activity "as tolerated" and instructed to eat a "heart healthy" diet.  On January 18, 2011, he underwent a stress echocardiogram, at which it was noted that "there was exercised-induced ectopy: AFib/flutter at peak heart rate."

On January 25, 2011, Wallis had a follow-up visit with another cardiologist, Philip Fitzpatrick, M.D.  Dr. Fitzpatrick reported that Wallis "has a history of paroxysmal atrial fibrillation"[2] and noted that his stress echocardiogram "was remarkable for the development of recurrent atrial fibrillation."  He noted that Wallis seemed to be tolerating the beta-blocker well (though he did report feeling a bit "fuzzy").  In his "Clinical Summary," Dr. Fitzpatrick, like Dr. Hunter, reported that Wallis suffered from "organic heart disease," and noted the new onset atrial fibrillation, incomplete left bundle

---

[2]     According to HCC Life's expert, Doctor Jonathan Alexander, "Atrial fibrillation may be occasional, persistent, or permanent.  Occasional atrial fibrillation is called paroxysmal atrial fibrillation ('PAF').  For individuals having PAF, symptoms may come and go, lasting for a few minutes to hours and then stopping on their own.  An individual with PAF is much more likely to develop persistent atrial fibrillation as compared to someone who has never had atrial fibrillation.  If an individual has persistent atrial fibrillation, then he or she will need treatment such [as] electrical shock or medication in order to restore a normal heart rhythm."  Declaration of Jonathan Alexander, MD, FACP, FACC, at para. 8.

branch block, and mild left ventricular hypertrophy.  Wallis was again prescribed a daily beta-blocker and aspirin.

On June 15, 2011, at the request of Dr. Fitzpatrick, a third cardiologist - Jamie Kim, M.D. - consulted with Wallis for "symptomatic paroxysmal atrial fibrillation."  Dr. Kim noted that Wallis presented to the hospital with atrial fibrillation and has been "treated with ASA [aspirin] and a beta-blocker since then."  He also noted that, "there was some concern of possible side effects to beta-blocker therapy initially, but [Mr. Wallis] states that now he seems to tolerate the medication without noticeable side effects."  In his "Clinical Summary" and "Assessment," Dr. Kim noted that Wallis suffers from "organic heart disease," but has had "good control of arrhythmias on current regimen.  I agree with ASA [aspirin] and beta-blocker therapy for now."  And, finally, Dr. Kim opined that if Wallis should have "recurrences of symptomatic PAF, then antiarrhythmic [medications] should be considered as the next step.  If he fails an antiarrhythmic, then ablation [a medical procedure aimed at correcting atrial fibrillation] can be considered.  I discussed the importance of treatment of AF within 48 hours should a sustained episode recur."

In October of 2011, Wallis's primary care physician, Dmitry Tarasevich, M.D., gave Wallis a "Comprehensive Medical Evaluation," at which Wallis reported that he had been feeling "tired lately" and experiencing occasional heart palpitations - a symptom of atrial fibrillation.  Dr. Tarasevich and Wallis also discussed the possibility of Wallis undergoing the ablation procedure that Dr. Kim had mentioned.  Wallis saw Dr. Kim again in December of 2011 for "follow-up of symptomatic PAF."  He stated that he did not believe that he had suffered any recurrences of atrial fibrillation, but reported that he was feeling more fatigued, speculating that it might be related to his beta-blocker therapy.  Dr. Kim opined that "it is difficult to know if Mr. Wallis is having symptoms related to [atrial fibrillation] or to medical therapy.  If it becomes clear that PAF is driving his symptoms, we discussed options for treatment, including alternative medication versus catheter ablation. Preliminarily, he seems to favor the latter approach."  In an effort to address a potential source of Wallis's fatigue, Dr. Kim adjusted Wallis's medications to taper him off the beta-blocker and recommended a follow-up visit in two months.

In February of 2012, Wallis again saw Dr. Kim as a "follow-up of symptomatic PAF."  He reported that Wallis had stopped taking the beta-blocker and was not aware of having experienced

further episodes of symptomatic atrial fibrillation.  But, they again discussed various options (including ablation) should those symptoms recur.  Dr. Kim recommended a follow-up visit in six months.

In August of 2012, Wallis had another office visit with Dr. Kim.  He reported that he continued to feel better off the beta-blocker and had not had any recurrence of symptoms.  Dr. Kim did note that Wallis reported "recent insomnia and anxiety; questionable etiology."  And, as he had done previously, Dr. Kim continued to report that Wallis suffered from "organic heart disease," with "left bundle branch block" and "mild left ventricular hypertrophy."  Although Wallis was no longer taking a beta-blocker, Dr. Kim continued to prescribe daily aspirin (325 mg).  Dr. Kim also recommended another follow-up visit in one year (though the record does not appear to contain Dr. Kim's notes from that visit).

In October of 2012, Wallis had an appointment with his primary care physician, Dmitry Tarasevich, M.D.  In discussing Wallis's atrial fibrillation, Dr. Tarasevich noted that Wallis was "Doing well.  In regular rhythms.  Trigger avoidance on Aspirin.  Follow-up with Dr. Kim yearly.  No need for ablation."

8

In summary then, Wallis was admitted to the hospital on January 9, 2011, diagnosed with atrial fibrillation, and treated with a beta-blocker and aspirin.  During a stress echocardiogram, he experienced "exercised-induced ectopy: AFib/flutter at peak heart rate."  Through at least June of 2011, he tolerated the medications well and maintained good control of arrhythmias.  A few months later, in October of 2011, he reported having occasional heart palpitations.  He then appears to have remained symptom free for at least a few months and, in December of 2011, Dr. Kim began tapering him off the beta-blocker.  Nevertheless, he was instructed to continue taking a daily regimen of aspirin.  From the date of his hospital admission, through at least August of 2012 (approximately 18 months) he was routinely seen by cardiologists, as a follow-up to the incident that led to his admission to the hospital.  Each of the three consulting cardiologists reported that Wallis suffers from "organic heart disease."  And, during that period, Wallis repeatedly discussed with his treating physicians the fact that, due to his heart disease, he might need to undergo either antiarrhythmic drug therapy, cardioconversion, or catheter ablation.

II.   <u>The Policy and Policy Application</u>.

At some point in early 2014, Wallis began looking into a short-term, non-renewable medical insurance policy with HCC Life.  Insurance policies of that sort are intended to provide comparatively low-cost, short-term medical coverage to people who experience gaps in insurance coverage (due, for example, to a change in jobs).  Wallis testified that he looked into getting coverage under the Affordable Care Act, but found it was too difficult "because of the onslaught of people moving into the Obamacare plan."

On March 21, 2014 (fewer than three and one-half years after his hospitalization and diagnosis of "organic heart disease"), Wallis completed an application for short-term medical insurance with HCC Life.  HCC Life's short-term policies provide temporary coverage to individuals without significant existing medical issues; they do not provide coverage for "pre-existing conditions."  Accordingly, those policies require "medical underwriting" in the form of a short medical questionnaire as part of the application process.  The application informed Wallis, in bold text, that if he answered "yes" to any one of the first four questions, "coverage cannot be issued."  Question no. 3 on that application asked:

> Within the last 5 years, has any applicant been
> <u>diagnosed, treated, or taken medication for, or
> experienced signs or symptoms of</u>, any of the
> following: . . . <u>heart disease</u> including heart attack,
> chest pain or had heart surgery . . . ?

HCC Life STM Application (document no. 21-2).  Wallis answered

"No" to that question.  At his deposition, he explained his

response by stating that he didn't believe that he suffered from

"heart disease."  Instead, he said he thought he had a "heart

condition," something about which the application did not ask.

Wallis Deposition at 24.


Wallis also seems to suggest that his response to Question

3 (even if inaccurate) was immaterial because, <u>prior to

completing</u> the application, he says he spoke with one of HCC

Life's agents on the telephone and:

> Well, they asked me about my medical history.  That
> came up. . . . I responded to a question and told them
> that I had an AFib occurrence in January of 2011.

Wallis Deposition (document no. 17-1) at 68.  Wallis does not

claim to have informed the agent that he was hospitalized as a

result of that "occurrence," or that he was diagnosed with

"organic heart disease," or that he was prescribed medications

for the condition, or that he was followed by a cardiologist for

more than 18 months.  Nor does Wallis claim the agent with whom

he allegedly spoke counselled him on how to complete HCC Life's medical questionnaire, nor does he assert that the agent authorized (or even instructed) him to respond "no" when asked whether he had been diagnosed with, or treated for, heart disease.  See Id. at 74 (testifying that his conversation with the agent did not influence how he answered the questionnaire).

In reliance upon the statements Wallis made in his application form, HCC Life issued a short-term medical insurance policy, with an effective date of April 1, 2014 (the "Policy") (document no. 12-2).  On July 9, 2014 - three months after the effective date of the Policy - Wallis told his primary care physician (Dr. Tarasevich) that he had been having "trouble sleeping for the past 6 months" - that is, to a time prior to the date on which he completed his application for insurance - and sometimes found "it hard to take a breath while in bed."  On examination, Wallis was found to be in atrial fibrillation.  He was put back on a beta-blocker and referred back to Dr. Kim, who recommended that Wallis undergo cardioconversion to restore normal sinus rhythm.  That procedure was performed in late July, but proved unsuccessful.  Subsequent testing revealed that Wallis suffered from nonischemic cardiomyopathy (a chronic disease of the heart muscle), related to his atrial fibrillation.  In August of 2014, Wallis underwent a second

cardioconversion, which was also unsuccessful.  Eventually, in
September of 2014, Wallis underwent a cardiac ablation, which
was successful.  In October, it was reported that he was doing
well "after ablation for atrial fibrillation."

As HCC Life was processing Wallis's claims for the
cardioconversion procedures and the ablation, it determined that
Wallis had "received medical treatment, diagnosis, care, or
advice [for his atrial fibrillation] within the two (2) year
period immediately preceding" the Policy's effective date of
April 1, 2014.  See The Policy, Part VI - Exclusions (document
no. 12-3) at 18.  See also Wallis's Medical Reports (document
no. 12-4) at 39 (Dr. Kim's medical notes from an August 22,
2012, "follow-up for symptomatic PAF").  Because that visit
occurred within two years of the Policy's effective date, and
because Dr. Kim provided "medical treatment, diagnosis, care or
advice" for Wallis's atrial fibrillation (including, for
example, a review and renewal of the medication Wallis had been
prescribed, as well as a discussion about antiarrhythmic drug
therapy and catheter ablation), HCC concluded that Wallis's
atrial fibrillation constituted a "pre-existing condition" as
defined in, and excluded by, the Policy.  Accordingly, it denied
Wallis's claims.  And, upon discovering that Wallis had been
"diagnosed, treated, or taken medication for, or experienced

13

signs or symptoms" of heart disease (i.e., atrial fibrillation) within the five-year period immediately preceding his March 21, 2014, application, HCC Life rescinded the Policy and refunded all premiums Wallis had previously paid.  <u>See</u> HCC Life STM Application, Question No. 3.

In November of 2015, Wallis filed a declaratory judgment action in state court.  And, following removal, HCC Life filed counterclaims, seeking rescission and declaratory relief.  As noted above, HCC Life now moves for summary judgment on those two counterclaims.

## Discussion

In support of its motion, HCC Life advances two arguments. First, it asserts that Wallis's statement about not having had, or been treated for, "heart disease" during the five year period prior to his application was both material and false. Accordingly, HCC Life says the Policy is void ab initio, it was properly rescinded, and HCC Life is not obligated to pay any claims under the Policy.  Alternatively, says HCC Life, even if the Policy is valid and enforceable, the charges incurred by Wallis related to the cardioconversion and ablation resulted, either directly or indirectly, from a condition for which Wallis received medical treatment, diagnosis, care, or advice within

the two year period immediately prior to the Policy's effective
date (i.e., follow-up visit with Dr. Kim in August of 2012).
Therefore, says HCC Life, coverage for those procedures is
specifically excluded from the Policy.  Wallis objects.


I.   Rescission of the Policy.

New Hampshire law limits the ability of insurers to cancel
policies based upon false statements contained in policy
applications.  Specifically,

> The falsity of any statement in the application for
> any policy covered by this chapter shall not bar the
> right to recovery thereunder, unless such false
> statement was made with actual intent to deceive, or
> unless it materially affected either the acceptance of
> the risk or the hazard assumed by the insurer.

N.H. Rev. Stat. Ann. ("RSA") 415:9 (emphasis supplied).  With
respect to the first prong of that test, Wallis asserts that he
had no intent to deceive HCC Life when he represented that he
had not been diagnosed with, or received treatment for, "heart
disease" within five years of his application.  As noted above,
he asserts that he honestly believed that he suffered from a
"heart condition," not "heart disease" - a distinction he says
is meaningful.  At a minimum, he claims his subjective intent is
a genuinely disputed material fact that precludes entry of
summary judgment.

At this juncture, HCC Life is focused on the second prong of that statutory test ("materially affected the risk assumed"). It argues that even if Wallis had no subjective intent to mislead, still, his failure to report his admission to the hospital for atrial fibrillation and his subsequent treatment for that condition, <u>materially affected</u> its acceptance of the risk assumed.  It has long been established in New Hampshire that "a false statement as to medical history is held to affect the acceptance of the risk as a matter of law."  <u>Manelas v. Nat'l Acc. & Health Ins. Co.</u>, 89 N.H. 559, 560 (1938).  <u>See also Amoskeag Trust Co. v. Prudential Ins. Co. of Am.</u>, 88 N.H. 154, 163 (1936) ("a false statement as to medical history is by the better view material as a matter of law.").  Moreover, HCC Life has submitted uncontroverted evidence that had Wallis answered "yes" to question 3 on the application and revealed his diagnosis of, and treatment for, atrial fibrillation, HCC Life would not have issued the Policy.  <u>See</u> Affidavit of Marcus Such (document no. 12-9) at paras. 4-6.

In response, Wallis claims to have disclosed his atrial fibrillation to an agent of HCC Life prior to completing the application.  Accordingly, he argues that:

> there is an issue of material fact as to whether or
> not Defendant satisfies the elements required by the

> second prong given that, <u>despite Plaintiff's answer to
> Question 3</u> on the Application, <u>Defendant knew about
> the atrial fibrillation</u> and cannot now argue that the
> answer to Question 3 materially affected Defendant's
> ability to accept the risk.

Plaintiff's Memorandum (document no. 14-1) at 11 (emphasis
supplied).  While his argument is not developed in detail, he
seems to assert that because HCC Life was allegedly aware,
through its agent, that he "had an AFib occurrence in January of
2011," Wallis Deposition at 68, and yet still elected to issue
the policy, it cannot now be heard to assert that his atrial
fibrillation was a disqualifying condition.  That is, Wallis
seems to suggest that HCC Life either waived, or is now estopped
to assert, the defense that Wallis's application contained a
materially false statement about his medical history.[3]  In a
somewhat related claim, he seems to imply that HCC Life is
estopped to deny coverage for his medical procedures because he
obtained "pre-authorizations" for each of them.

    Turning first to Wallis's latter argument, the Policy
plainly provides that "Pre-certification does not guarantee
benefits - The fact that expenses are Pre-certified does not

---

[3]     As one learned treatise has observed, "The doctrines of
waiver and estoppel are often asserted together and courts have
confused the application of the two doctrines or treated them as
being the same."  J. Thomas, New Appleman on Insurance Law
Library Edition § 16.08[1][g] (LexisNexis 2016).

guarantee either payment of benefits or the amount of benefits.
Eligibility for and payment of benefits are subject to the
terms, conditions, provisions and exclusions herein." The
Policy at 17 ("Pre-Certification Requirements"). Consequently,
the fact that Wallis received pre-certification from HCC Life
for the procedures does not require HCC Life to reimburse him
for the related expenses. HCC Life retained the contractual
right to enforce the provisions of the Policy - provisions which
clearly and unambiguously excluded coverage for pre-existing
conditions. See generally Godbout v. Lloyd's Ins. Syndicates
Messrs. Mendes & Mount, 150 N.H. 103, 105 (2003) (noting that
the "interpretation of insurance policy language is a question
of law for this court to decide" and it will "construe the
language of an insurance policy as would a reasonable person in
the position of the insured based on a more than casual reading
of the policy as a whole." Additionally, the court observed
that, "where the terms of a policy are clear and unambiguous, we
accord the language its natural and ordinary meaning" and "need
not examine the parties' reasonable expectations of coverage
when a policy is clear and unambiguous; absent ambiguity, our
search for the parties' intent is limited to the words of the
policy.") (citations and internal punctuation omitted).

As for Wallis's assertion that HCC Life waived, or is estopped to assert, the argument that Wallis failed to disclose a disqualifying medical condition, there is simply insufficient evidence to support Wallis's claim that he actually disclosed his heart disease to HCC Life (either prior to, or even after, completing the application).  HCC Life has searched its records and found no evidence that Wallis contacted any of its agents during the entire month of March, 2014.[4]  And, Wallis's telephone records do not support his claim that such a call occurred.

According to Wallis, his conversation with an agent of HCC Life took place very close to, or perhaps even on, the same day he completed the HCC Life application (March 21, 2014).  Wallis Deposition at 72.  But, he testified that when he made that telephone call, he had not yet seen the application.  Id.  He does not remember the telephone number he called, but does recall that he made the call from his cell phone.  Id.  For its part, HCC Life says it could find no record of Wallis's claimed telephone conversation with one of its agents at any time prior to the date on which he completed that application.  Indeed, a review of Wallis's cell phone records from January through April

---

[4]    HCC Life did find an audio recording of a conversation Wallis had with one of its agents in April of 2014 (after the Policy was already in effect), during which Wallis inquired about updating an expired credit card.

of 2014, reveals that he never placed a call to any of the
telephone numbers used by HCC Life.  See Affidavit of Lori Long
(document no. 19-3) at para. 2.  On the afternoon of March 21,
2014 (the day he completed the application), Wallis did
telephone a different insurance provider: Anthem Blue Cross &
Blue Shield.  See AT&T Telephone Log (document no. 19-4) at 19
(outgoing call from Wallis's cell phone to a telephone number
used by Anthem).  So, it is possible that he is confused and
mistakenly believes that his call to Anthem was actually a call
to HCC Life.

Nevertheless, on this record a jury could not plausibly
conclude that, prior to completing the application for
insurance, Wallis informed HCC Life that he "had an AFib
occurrence in January of 2011."  Wallis Deposition at 68.  See
generally Scott v. Harris, 550 U.S. 372, 380 (2007) ("When
opposing parties tell two different stories, one of which is
blatantly contradicted by the record, so that no reasonable jury
could believe it, a court should not adopt that version of the
facts for purposes of ruling on a motion for summary
judgment.").

The court is left with Wallis's assertion that while the
application asked him about "heart disease," he honestly

believed he merely had a "heart condition."   That argument, too,
is insufficient to stave off summary judgment.   First, Wallis
has provided no support for his claim that, in either the
medical context or health insurance context, there is a material
difference between a "heart condition" and "heart disease."
Indeed, Wallis himself argues:

> Question 3 specifically requests information on
> "diseases" and the experts for Plaintiff and Defendant
> offer differing opinions as to whether or not atrial
> fibrillation is a "disease" or a "condition" as it
> appears that both experts use the terms
> interchangeably.

Plaintiff's memorandum at 11.   If, as Wallis suggests, the terms
are used "interchangeably," then they are synonyms and have no
substantial difference in meaning.   That point was reinforced by
plaintiff's own expert, Dr. Jonathan Gomberg, M.D., who
testified that he "would use the two words interchangeably,"
explaining that "there's no meaningful difference between the
two words."   Gomberg Deposition (document no. 12-7) at 28.   So,
when the application asked Wallis whether he suffered from any
"heart disease," it was necessarily asking whether he suffered
from a "heart condition" (as well as any heart "disorder,"
"illness," or "ailment").

21

Moreover, under the second prong of the test set forth in RSA 415:9, Wallis's subjective intent or understanding is immaterial.  The only relevant question is whether the response he gave to Question 3 was false.  It was.  Wallis's medical records contain numerous references to the fact that he was diagnosed with "organic heart <u>disease</u>."  And, as noted above, that false statement materially affected HCC Life's willingness to accept his application for medical insurance, as well as the scope of the risk it knowingly assumed.  HCC Life was, therefore, acting within the law when it rescinded the Policy.

II.  <u>Exclusions under the Policy</u>.

Even if HCC Life acted improperly in rescinding the Policy, it is plain that coverage for the medical procedures Wallis underwent beginning in July of 2014 was specifically excluded from the scope of the Policy.  Part VI of the Policy, entitled "Exclusions" provides that:

> Pre-existing Conditions - Charges resulting directly or indirectly from a <u>condition</u> for which a Covered Person received medical treatment, diagnosis, <u>care or advice</u> within the two (2) year period immediately preceding such person's Effective Date are excluded for the six (6) months of coverage hereunder.

The Policy, Section VI, para. 1 (emphasis supplied).  The effective date of Wallis's policy was April 1, 2014.  And,

within the two-year period preceding that date, Wallis plainly received "medical treatment, diagnosis, care or advice" for his atrial fibrillation.  As noted above, on August 22, 2012, Wallis had an office visit with his cardiologist, Dr. Kim, for "follow-up for symptomatic PAF."  During that visit, Dr. Kim again reported that Wallis suffers from "organic heart disease," he reviewed Wallis's then-current medications and recommended Wallis continue to take 325 mg of aspirin daily, he examined Wallis's heart, he noted that Wallis seemed to be "in good control . . . on current regimen," he discussed with Wallis the possibility of needing either "antiarrhythmic therapy or catheter ablation," and he recommended another follow-up visit in a year.  See Wallis's Medical Reports at 39-40.

In his memorandum, Wallis makes no mention of that appointment with Dr. Kim, nor does he address HCC Life's assertion that, because it occurred within two years of the Policy's effective date, it serves to exclude coverage for Wallis's subsequent cardioconversions and ablation.  Instead, Wallis focuses solely on the fact that his original hospitalization and diagnosis occurred on January 9, 2011 - outside the two-year window addressed by the Policy's exclusions.  And, he claims to have been "symptom free" for the

two-year period prior to the Policy's effective date and until
after the Policy was in effect.  Accordingly, he argues that:

> The January 9, 2011 event, the event that Defendant
> wants to use to rescind Plaintiff's coverage, cannot,
> per the policy's definitions, be considered a pre-
> existing condition.  The July 2014 and September 2014
> events were post application, not preceding events.

Plaintiff's Memorandum at 12.  Wallis's argument is
unpersuasive.


As noted above, the Policy's exclusion for pre-existing
conditions is not limited to medical conditions that were
"diagnosed" within the two-year period.  Nor is it limited to
conditions that required "treatment" within that period.  The
exclusion is broader, providing that coverage is excluded for
charges relating to any medical condition for which the insured
received "treatment, diagnosis, care or advice."  The Policy,
Part VI - Exclusions, at 18 (emphasis supplied).  And, HCC
Life's argument is focused on the office visit with Dr. Kim in
August of 2012, during which Wallis plainly received care and/or
advice regarding his paroxysmal atrial fibrillation - care
and/or advice that was provided within two years of the Policy's
effective date.  Finally, it is plain that Wallis's subsequent
cardioconversions and ablation relate, either directly or
indirectly, to his atrial fibrillation.

HCC Life was, therefore, within its contractual rights when it denied Wallis's claims for reimbursement under the clear and unambiguous language of the Policy's Exclusions for pre-existing conditions.

Parenthetically, the court notes that even if there were evidence to support Wallis's claim that, in March of 2014, he disclosed to an agent of HCC Life that he had "an AFib occurrence in January of 2011," and even if HCC Life had issued the Policy despite such knowledge, those facts likely would not have prevented HCC Life from enforcing the terms of the Policy's pre-existing condition exclusion.  Wallis does not claim he inquired about coverage for his heart disease, nor does he claim the agent assured him that any treatment(s) related to his heart disease would be covered.  Thus, given the plain language contained in the Policy's pre-existing condition exclusion, Wallis likely could not have argued that he reasonably believed the Policy would provide coverage for procedures relating to his (pre-existing) heart disease.  See generally, Trefethen v. New Hampshire Ins. Group, 138 N.H. 710, 714-15 (1994) (noting that the court has applied the doctrine of estoppel to provide coverage, despite express policy language to the contrary, when the insured reasonably believed coverage existed based upon

conversations with an agent of the insurer).  See also Godbout, 150 N.H. at 106 (distinguishing Trefethen and noting that the policy plainly excluded coverage for the accident in question, and the insured did not request, nor did the agent promise, coverage for that activity; consequently, the insured could not plausibly claim he "reasonably expected" coverage either under the policy language, or based on conversations with the agent).

### Conclusion

For the foregoing reasons, as well as those set forth in defendant's legal memoranda, HCC Life's motion for summary judgment (document no. 12) is granted as to both of its counterclaims.  HCC Life acted lawfully when it rescinded the Policy based upon the false statement of medical history Wallis provided in response to Question 3 on the application. Moreover, even if HCC Life had not been entitled to rescind the Policy, it would not have been obligated to provide coverage for the cardioconversions and ablation related to Wallis's atrial fibrillation under the Policy's provisions that exclude coverage for pre-existing conditions.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 3, 2017

cc:  Steve J. Bonnette, Esq.
     William D. Pandolph, Esq.